1  MARC J. FAGEL (CA BAR NO. 154425)
   MICHAEL S. DICKE (CA BAR NO. 158187)
2  (dickem@sec.gov)
   SUSAN F. LAMARCA (CA BAR NO. 215231)
3  (lamarcas@sec.gov)
   SHEILA E. O'CALLAGHAN (CA BAR NO. 131032)
4  (ocallaghans@sec.gov)
   CAMERON P. HOFFMAN (CA BAR NO. 229316)
5  (hoffmanc@sec.gov)

6  Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
7  44 Montgomery Street, Suite 2600
   San Francisco, California 94104
8  Telephone: (415) 705-2500
   Facsimile: (415) 705-2501
9

10

11                        UNITED STATES DISTRICT COURT

12                       NORTHERN DISTRICT OF CALIFORNIA

13                              SAN JOSE DIVISION

14

15  SECURITIES AND EXCHANGE COMMISSION,        Case No.

16              Plaintiff,
                                               COMPLAINT
17       vs.

18  CHRISTOPHER SELLS and TIMOTHY
    MURAWSKI,
19
                Defendants.
20

21

22       Plaintiff Securities and Exchange Commission (the "Commission") alleges:

23                            **SUMMARY OF THE ACTION**

24       1.       Defendants Christopher Sells and Timothy Murawski, the former Vice President of

25  Commercial Operations and Vice President of Sales, respectively, of Hansen Medical, Inc. ("Hansen

26  Medical") violated the antifraud and related provisions of the federal securities laws.  In 2008 and

27  2009, Sells orchestrated a scheme to defraud the investors of Hansen Medical by using undisclosed

28  trickery to make it appear that the company had successfully sold its largest and most expensive

SEC v. Christopher Sells & Timothy Murawski
COMPLAINT

1   product when it had not actually completed the sales.  Murawski actively participated in the scheme.

2   As a result, Hansen Medical reported grossly inflated sales revenue to its investors and to the market.

3       2.       Hansen Medical sells medical equipment to hospitals.  As Sells and Murawski were

4   aware, Hansen Medical had a policy, which was described to the public and to its shareholders, to

5   determine when a sale was complete and revenue from the sale could properly be recorded by the

6   company.  Key to that policy were the requirements that the company's medical equipment had

7   actually been installed in the purchasing hospital, and that Hansen Medical had actually trained at

8   least one physician from the purchasing hospital who would be operating the equipment.

9       3.       Sells and Murawski engaged in a myriad of schemes to make it appear that sales had

10  been completed, when they had not.  Among those schemes, Sells and Murawski directed Hansen

11  Medical personnel to install the large Hansen Medical equipment at purchasing hospitals before the

12  hospitals were ready for the installation, and then immediately dismantle the equipment and place it

13  in storage for months.  In another instance, Sells and Murawski knew that Hansen Medical could not

14  actually train the physicians, as required, before the last day of Hansen Medical's fiscal year, so they

15  directed the forgery of a doctor's signature on the training form to make it falsely appear that all the

16  necessary steps had been taken for the sale by the end of the year.  In another transaction, Sells

17  entered into a separate, undisclosed oral side agreement to offer different terms to a purchaser, so that

18  the purchaser would not have to keep the expensive Hansen Medical equipment if it could not

19  successfully resell it to a hospital.

20      4.       Sells and Murawski hid their schemes and devices from company accountants and

21  from the company's independent auditors, and circumvented the company's policies to make it

22  appear that they had completed more sales than they had.  As a result, Hansen Medical improperly

23  recorded revenue for the transactions, which materially inflated the company's reported financial

24  performance.

25      5.       Sells and Murawski thus violated the antifraud provisions of the Securities Act and the

26  Exchange Act that prohibit persons from engaging in schemes to defraud and employing deceptive

27  devices, and further violated statutes and rules under the Exchange Act prohibiting the falsification of

28  records and the circumvention of internal accounting controls.  Sells also made false or misleading

1    statements or material omissions to an accountant, and he aided and abetted Hansen Medical's

2    violations of antifraud provisions of the Exchange Act prohibiting materially false and misleading

3    statements, and both Sells and Muraski futher aided and abetted Hansen Medical's violations of

4    provisions under the Exchange Act requiring a public company to accurately file periodic reports and

5    to maintain accurate books, records, and accounts and a reasonable system of internal accounting

6    controls.

7          6.     Sells and Murawski will, unless enjoined, continue to engage in the acts, practices and

8    courses of business alleged herein, or in transactions, acts, practices and courses of business of

9    similar purport and object.

10          7.     The Commission seeks an order enjoining Sells and Murawski from future violations

11    of the federal securities laws they violated, and imposing civil money penalties, and prohibiting Sells

12    from serving as an officer or director of any public company.

13                                    **JURISDICTION AND VENUE**

14          8.     The Commission brings this action pursuant to Sections 20(b), 20(c) and 22(a) of the

15    Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections

16    21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and

17    (e)].

18          9.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and

19    22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27

20    of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

21          10.    Sells and Murawski, directly or indirectly, made use of the means or instrumentalities

22    of interstate commerce, or of the mails, or of the facilities of a national securities exchange in

23    connection with the transactions, acts, practices and courses of business alleged herein.

24          11.    Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15

25    U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Sells and Murawski

26    engaged in acts, practices and courses of business that constitute violates of the Securities Act and the

27    Exchange Act in this District.

28

12.     Intradistrict assignment to the San Jose Division is proper pursuant to Civil Local Rule 3-2(c) because a substantial part of the events or omissions which give rise to these claims occurred in Santa Clara County.

## DEFENDANTS

13.     Defendant Christopher Sells, age 49, resides in Dallas, Texas. From June 2008 through October 2009, Sells was Hansen Medical's Senior Vice President of Commercial Operations. Sells resigned at the request of Hansen Medical's CEO when Hansen Medical's audit committee concluded an internal investigation in late 2009. Sells is currently a vice president at a medical device company. Before his employment at Hansen Medical, Sells was the vice president of sales at a medical device company that issued securities to the public.

14.     Defendant Timothy Murawski, age 50, resides in Lake Zurich, Illinois. From July 2008 through October 2009, Murawski was the Director of National Accounts and Vice President of Sales for Hansen Medical. He reported directly to Sells. Immediately prior to joining Hansen Medical, Murawski worked with Sells at the same public medical device company, and Sells recruited him to come to Hansen Medical. Murawski currently works for the same medical device company as Sells, and again reports to Sells.

## RELATED ENTITY

15.     Hansen Medical, Inc. is a medical equipment company founded in 2002 and headquartered in Mountain View, California. From November 2006, when it initially offered its stock to the public, through the present, Hansen Medical issued common stock registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the Nasdaq Global Market. Hansen Medical's fiscal year ends on December 31 and the company reports its annual financial results as of that date, and it additionally reports its financial results quarterly as of March 31, June 30, and September 30. In May 2007, Hansen Medical received FDA approval for its primary product, medical equipment it markets as the Sensei Robotic Catheter System ("Sensei system"), and sells primarily to hospitals for use in cardiac surgical procedures.

1                                  **FACTUAL ALLEGATIONS**

2     **A. Hansen Medical's Disclosed Policy for Recording Sales Revenue**

3        16.     From in or around November 2007 through approximately November 2009, Hansen

4 Medical maintained a policy, described to the public, for determining when revenue from the sales of

5 its Sensei systems could properly be recorded, based on American Institute of Certified Public

6 Accountants, Statement of Position 97-2, Software Revenue Recognition (hereafter "SOP 97-2").

7 Hansen Medical's policy sought to ensure that its Sensei system was properly installed in a hospital

8 and that the hospital's physicians were trained on its proper use.  Additionally, Hansen Medical did

9 not have any means of valuing its training and installation separately. Accordingly, under Hansen

10 Medical's announced policy, before revenue from a sale was recorded, Hansen Medical first required

11 both installation of the Sensei system and physicial training to be completed.

12        17.     To properly install a Sensei system, personnel from Hansen Medical's field services

13 group spent one to two days at the purchasing hospital, due to the complexity of the equipment.   The

14 field services group then submitted to Hansen Medical's finance department an installation

15 completion form, signed by the Hansen Medical installer and by a representative from the customer,

16 which Hansen Medical's customer service manager reviewed to make sure it was properly

17 completed.

18        18.     Hansen Medical trained physicians from the purchasing hospitals on the proper use of

19 the Sensei system at Hansen Medical facilities in California or Ohio.  Hansen Medical's clinical

20 group, which was responsible for observational and hands-on clinical training, signed an

21 acknowledgment form at the conclusion of the training, and obtained the trained physician's

22 signature on the form as well.   The clinical group then submitted the signed training form to Hansen

23 Medical's finance department, where it was reviewed by Hansen Medical's customer service

24 manager to make sure it was properly completed.

25        19.     To document the completion of the necessary steps for recording revenue from a sale,

26 a senior accountant in Hansen Medical's finance department included the installation and training

27 forms in a revenue recognition file, which she reviewed, that included the other, necessary

28 documentation for the transaction.  Once the senior accountant's review was complete, she provided

the files – including the installation completion and physician training forms –to Hansen Medical's Controller.  The Controller also reviewed the file, including the installation completion form and the physician training forms, to confirm that it was proper for Hansen Medical to record revenue from a Sensei system sale.

20.     At the end of each quarter, in connection with Hansen Medical's preparation of quarterly financial statements that it filed with the Commission on Forms 10-Q, the same revenue recognition files compiled for each Sensei system sale recorded during the quarter were provided to the company's independent audit firm.  The audit firm personnel reviewed the files to determine whether they agreed with Hansen Medical's decision to record revenue for the sales.

21.     Each of these steps followed in Hansen Medical's internal control process depended upon the truthful presentation of the evidence documenting all of the terms of a transaction as well as the completion of installation of the Sensei system and training of physicians at Hansen Medical's facilities on the Sensei system's proper use.

**B. Sells and Murawski Use Ploys and Devices to Circumvent Revenue Requirements**

22.     In or about April 2008, Hansen Medical hired Sells to lead the sales organization. Sells became the Senior Vice President of Commercial Operations. Thus, Sells was in charge of a wide array of key operations, including the sales organization, clinical training, field services (including installations), and customer service.  Sells was also made a member of Hansen Medical's disclosure committee.  In this role he was expected to review and provide comments on Hansen Medical's press releases and SEC filings each quarter, including the company's annual forms that included the company's financial statements.

23.     In or about July 2008, Sells hired Murawski as Director of National Accounts, where he was responsible for sales to large, national hospital chains.  In or around January 2009, Murawski assumed responsibility for all sales in the Midwest and the Northeast, and was promoted to Vice President of Sales.  Throughout his tenure at Hansen Medical, Murawski reported directly to Sells.

24.     Upon joining Hansen Medical, Sells and Murawski have admitted that they were informed of the criteria that needed to be met before the company could properly record revenue from a completed sale of a Sensei system.  In keeping with the publicly-described policy, Sells and

1    Murawski have admitted that they understood that both installation and physician training had to be

2    completed before revenue could be recorded for a sale.

3              a.    Sells and Murawski Use a Temporary Installation of a Sensei System to Inflate Sales
                     in the Third Quarter of 2008

4

5         25.    In or about September 2008, the sales staff of Hansen Medical was engaged in

6    negotiations with a customer hospital ("Hospital A") for the potential sale of a Sensei system.  On or

7    about September 15, 2008, Hospital A provided a purchase order to Hansen Medical in which

8    Hospital A agreed to pay Hansen Medical $700,000 to acquire a Sensei system.

9         26.    However, because Hospital A was in the midst of constructing a new lab where the

10   Sensei system would eventually be installed, the hospital asked to delay installation of the Sensei

11   system for approximately six to nine months.

12        27.    Aware of Hospital A's impediment to an immediate installation of the Sensei system,

13   Sells and Murawski engaged in series of ploys to make it appear that Hansen Medical's system had

14   been installed during Hansen Medical's third fiscal quarter, and that a sale had therefore been

15   completed.  At the direction of Sells and Murawski, on or around July 31, 2008, a Hansen Medical

16   sales representative proposed to Hospital A that the Sensei system be installed in a temporary

17   location at the hospital.

18        28.    In the e-mail to the hospital, the sales representative further committed that Hansen

19   Medical would "absorb and pay for ALL the reinstallation of your Sensei for the new lab once it is

20   ready."  Sells became aware of the email and reprimanded the sales representative for putting the

21   commitment to pay for reinstallation in writing.  As Sells understood, revenue from the sale to

22   Hospital A could not properly be recorded by Hansen Medical when the company had an outstanding

23   obligation to return to the hospital to reinstall the equipment at a later date.

24        29.    During a conference call on or around September 19, 2008 with Hospital A's

25   management, Sells and Murawski agreed that Hansen Medical would install the Sensei system

26   temporarily at Hospital A on or before September 30, 2008, but would then immediately dismantle

27   the system and place it in storage at the hospital.   Hansen Medical would later install the Sensei

28

1 | system permanently, when the hospital's lab was ready, with Hansen Medical paying all of the

2 | additional costs associated with the installation. Hospital A accepted this arrangement.

3 |      30.     On or about September 26, 2008, Hansen Medical personnel temporarily installed the

4 | Sensei system at Hospital A, but then immediately took the system apart and placed it into storage at

5 | Hospital A. The Hansen Medical personnel conducting the installation also obtained the necessary

6 | signatures from Hospital A on the installation completion form.

7 |      31.     The signed installation completion form indicating that the Sensei system had been

8 | properly and timely installed at Hospital A was then provided to Hansen Medical's customer service

9 | department, where it was reviewed for completion and then passed along to a senior accountant in the

10 | finance department for her review and for review by the company Controller. However, neither Sells

11 | nor Murawski, nor anyone acting at their direction, informed Hansen Medical's finance personnel

12 | that the Sensei system had been immediately dismantled and placed into storage at Hospital A, and

13 | that Hansen Medical was obligated to perform further work at Hospital A to permanently install the

14 | equipment at an as-yet-undetermined date in the future.

15 |      32.     Following the finance department's review of the forms for the purported Sensei

16 | system sale to Hospital A, Hansen Medical recorded approximately $700,000 in revenue during the

17 | third quarter of 2008.

18 |      33.     The installation completion form for Hospital A was also made available to Hansen

19 | Medical's independent auditor, who reviewed and concurred with the company's decision to record

20 | revenue for the apparent sale of a Sensei system to Hospital A during the third quarter of 2008.

21 |      34.     On or about October 23, 2008, Hansen Medical publicly announced its results for the

22 | third quarter, which ended on September 30, 2008. In that announcement, Hansen Medical reported

23 | that it had recorded revenue for "a single-quarter record of 14 Sensei [systems]." It further

24 | announced that those sales had "generated revenues of $10.9 million, a 214% year-over-year increase

25 | and the highest quarterly result in the company's history." On or about October 23, 2008, Hansen

26 | Medical management conducted a conference call with company investors and market analysts in

27 | which they repeated this information.

28 |

35.     On or about November 5, 2008, Hansen Medical filed with the Commission its Form 10-Q for the quarter ended September 30, 2008.  The financial statements included in Hansen Medical's Form 10-Q reported $700,000 in revenue inappropriately recorded from the Hospital A sale, which represented a material portion of Hansen Medical's product revenue reported during the quarter.

36.     In or about March 2009, several months after Hansen Medical inappropriately recorded revenue for the Sensei system sale to Hospital A, Hansen Medical personnel returned to Hospital A and installed the Sensei system in the hospital's new lab, at Hansen Medical's expense.

37.     Sells and Murawski knew, or were reckless in not knowing, that their conduct and the conduct of others carried out at their direction and with their approval, created the false appearance that Hansen Medical had completed a sale, to Hospital A and all the criteria for the company to properly record revenue from a sale had been met, when it had not.

   b.   Sells and Murawski Engage in a Scheme to Use Falsified Training Documents for a
        Purported Sale During the Fourth Quarter of 2008

38.     In or about December 2008, Hansen Medical was attempting to raise operating capital for the company.  During this period, Hansen Medical offered securities pursuant to a registration statement that had been filed with the Commission and which was effective on or about March 17, 2008, to raise up to approximately $75,000,000.

39.     Sells and Murawski were each aware of Hansen Medical's intention to raise funds for operations, and they believed that Hansen Medical needed to show strong Sensei system sales to help attract potential investors.

40.     On or about December 19, 2008, less than two weeks before the last day of Hansen Medical's 2008 fiscal year, Sells chastised Hansen Medical's sales personnel in an e-mail to them for weak sales, describing their efforts as "not acceptable from a senior sales team."  Sells stated: "this is a very important quarter with additional funding on the line for Hansen Medical."  Sells told them: "it is imperative that we find a way to finish in an acceptable manner."  With particular focus on the number of Sensei system sales for the quarter, Sells stated: "finish[ing] below 12 systems [sales]"

1    would jeopardize the company's current funding efforts or require layoffs." Sells signed the e-mail

2    "Grumpy Santa." Murawski responded to Sells' email: "Well said!"

3         41.    In or around December 2008, Sells was anxious to complete a sale to a customer

4    hospital ("Hospital B") before the end of 2008, so that Hansen Medical could record a sale, and

5    revenue for the sale, during the fourth quarter of 2008. Hospital B had sent Hansen Medical a

6    purchase order in which Hospital B agreed to purchase a Sensei system for $660,000 in or around

7    May 2008; however, the sale was subject to a condition requiring approval from the state in which

8    the hospital operated.

9         42.    On or about December 24, 2008, one week before the last day of Hansen Medical's

10   fiscal year, Sells sent an e-mail to Hospital B personnel telling them that there would be a price

11   increase if the transaction did not close in 2008. On or about December 27, 2008, Hospital B

12   informed Sells that the state had supplied the necessary approvals to allow Hospital B to purchase the

13   Sensei system.

14        43.    However, as Sells was aware, as of Sunday, December 28, 2008, no Hospital B

15   doctors had been trained by Hansen Medical to use the Sensei system and such training was required

16   before Hansen Medical could record revenue from the sale. As Sells was also aware, physician

17   training required that one or more doctors from Hospital B visit Hansen Medical's offices in either

18   Ohio or California and a full day engaged in hands-on and observational clinical training. Because

19   the physicians were not available to complete such physician training before the last day of the fiscal

20   year which fell just three business days from then, Sells and Murawski devised a plan to falsify the

21   physician training paperwork.

22        44.    Aware of the practical impossibility of completing the full Hansen Medical physician

23   training with the Hospital B physicians by December 31, 2008, on or about Monday, December 29,

24   Sells instructed the Hansen Medical clinical training representative assigned to the Hospital B

25   account to obtain the Hospital B doctors' signatures on the physician training form. On or about the

26   same day, Murawski also told the same Hansen Medical training representative that she needed to get

27   the Hospital B physicians to sign the training form no later than Wednesday, December 31, 2008.

28

45.     Further aware that the Hospital B doctors might not be willing to sign, or available to sign, the required training forms without actually having completed the necessary training, Murawski indicated to the Hansen Medical training representative that a forgery of their signatures would be acceptable.

46.     On or around December 30, 2008, one day before the last day of Hansen Medical's 2008 fiscal year, the training representative e-mailed the Hospital B doctors a request that they sign the required physician training forms acknowledging they had been trained, even though they had not yet been trained.  When the Hospital B doctors did not promptly respond to the e-mail request, the training representative forged the signature of one of the Hospital B doctors on the training form.

47.     The Hansen Medical training representative then sent the forged physician training forms indicating that the Hospital B physicians had been properly and timely trained to Hansen Medical's customer service manager, who reviewed it for completion and passed it along to the senior accountant in the finance department for her review and for review by the company Controller.

48.     Neither Sells nor Murawski, nor anyone else acting at their direction, informed the company's finance personnel that the physicians had not actually been trained to use the Sensei system.  The finance personnel also were also not told that the physician's signature on the training form had been forged.

49.     Following the finance department's review of the apparently completed forms for the Sensei system sale to Hospital B, including the forged physician training form, Hansen Medical recorded the purported sale to Hospital B during the fourth quarter of 2008, and revenue of $660,000 for the sale, and reported those figures in its 2008 year-end financial statements.

50.     The forged physician training form for Hospital B was also made available to Hansen Medical's independent auditing firm, in connection with its annual audit of the company's financial statements for the 2008 fiscal year.  Personnel from the audit firm reviewed the information for the sale to Hospital B.  Unaware that no physician had actually been trained to use the Sensei system and unaware that the physician's signature had been forged, they concurred with the company's decision to record revenue on the Hospital B sale during the fourth quarter of 2008.

1       51.    In or about June 2009, months after Hansen Medical inappropriately recorded revenue

2 for the Sensei system sale to Hospital B, Hansen Medical training personnel completed a physician

3 training on the Sensei system with a physician from Hospital B.

4       52.    Sells and Murawski knew, or were reckless in not knowing, that their conduct and the

5 conduct of others carried out at their direction and with their approval, created the false appearance

6 that Hansen Medical had completed a sale to Hospital B, and all the criteria for the company to

7 properly record revenue from a sale had been met, when it had not.

8            c.   <u>Sells Enters Into an Undisclosed Oral Side Agreement in a December 2008 Sales Transaction</u>

9

10       53.    In or about December 2008, personnel from a customer ("Hospital C") discussed with

11 Hansen Medical sales personnel potentially purchasing a Sensei system, but informed the Hansen

12 Medical sales personnel that they did not have sufficient funds to buy the system at that time. To

13 complete the transaction by the end of 2008, Sells orchestrated a scheme entailing a three-way

14 transaction in which a third party leasing company, with whom Sells had a prior business

15 relationship, agreed to buy the system from Hansen Medical and lease it to Hospital C.

16       54.    On or about December 8, 2008, the leasing company entered into a leasing

17 arrangement with Hospital C. The lease gave Hospital C the right to return the system to the leasing

18 company in six months by paying a minimal fee.

19       55.    The leasing company's principal asked Sells for assistance from Hansen Medical to

20 limit the risk to the leasing company in the event that Hospital C returned the system to the leasing

21 company. In a phone call, Sells verbally agreed that, if the hospital returned the Sensei system to the

22 leasing company, Hansen Medical would help market the Sensei system and that Hansen Medical

23 would make the leasing company whole.

24       56.    As Sells was aware, the separate agreement that he entered into on behalf of Hansen

25 Medical with the leasing company ran counter to Hansen Medical's stated policies for sales and

26 recording revenue from sales. As Hansen Medical informed the public in its Form 10-K for fiscal

27 year 2007, filed February 28, 2008, "Our standard terms do not allow for contingencies, such as trial

28 or evaluation periods, refundable orders, payments contingent upon the customer obtaining financing

1  or other contingencies which would impact the customer's obligation. In situations where

2  contingencies such as those identified are included, all related revenue is deferred until the

3  contingency is resolved."

4      57.     With Sells' promise in place, on or about December 22, 2008, the leasing company

5  sent a purchase order to Hansen Medical in which the leasing company agreed to purchase a Sensei

6  system from Hansen Medical for $650,000. The purchase order did not mention the separate

7  agreement Sells had made with the leasing company to ensure that it was made whole in the event of

8  a return of the Sensei system by Hospital C. Sells did not reduce the agreement to writing nor

9  include the terms with other documentation regarding the sale to the leasing company.

10      58.     Hansen Medical's senior accountant and Controller each reviewed the relevant

11  documents for the Hospital C transaction, including the purchase order, none of which included the

12  separate terms agreed to by Sells. Sells also did not inform the company's finance personnel, nor did

13  anyone working at his direction, that he had entered into an undisclosed side agreement with the third

14  party leasing company.

15      59.     Following the review of the file of documents supporting the recording of revenue for

16  the purported Hospital C sales transaction in the fourth quarter of 2008, including the signed contract

17  with the leasing company, Hansen Medical recorded approximately $650,000 in revenue on the sale

18  to the leasing company in its financial statements for Hansen Medical's fourth quarter ended

19  December 31, 2008.

20      60.     The file of documents supporting the recording of revenue for the Hospital C sales

21  transaction in the fourth quarter of 2008 was also made available to Hansen Medical's independent

22  audit firm. Personnel from the audit firm reviewed and concurred with the company's decision to

23  record revenue on the Hospital C sale in the fourth quarter of 2008.

24      61.     On or about March 3, 2009, in connection with the independent audit firm's audit of

25  Hansen Medical's 2008 year end financial statements, Sells signed a letter in which he expressly and

26  falsely confirmed to the auditors that all "oral or written side agreements" for fiscal year 2008 had

27  been disclosed to the auditors. Despite this representation, Sells did not disclose the separate, side

28

1  agreement he had arranged with the leasing company, nor did he inform the auditors of the additional

2  undisclosed terms to the transaction.

3       62.    Hospital C returned the Sensei system to the leasing company in the fall of 2009.

4  Based upon Sells' oral side agreement, the leasing company insisted that Hansen Medical accept

5  return of the Sensei system and provide a refund to the leasing company.

6       63.    Sells knew, or was reckless in not knowing, that his conduct and the conduct of others

7  carried out with his knowledge and approval, created the false appearance that Hansen Medical had

8  completed a sale to the leasing company involved in the Hospital C transaction, and all the criteria for

9  the company to properly record revenue from a sale had been met, when it had not.

10           d.   Hansen Medical Files Its 2008 Form 10-K Containing the Falsified Revenue from the

11              Hospital A, Hospital B and Hospital C Transactions

12       64.    On or about January 8, 2009, Hansen Medical publicly announced preliminary results

13  for the fourth quarter of 2008. In that announcement, Hansen Medical reported that it expected to

14  record revenue on 10 Sensei systems and expected to record fourth quarter revenues in the range of

15  $7.1 million to $7.4 million.

16       65.    On or about February 12, 2009, Hansen Medical publicly announced its final results

17  for the fourth quarter of 2008. In that announcement, Hansen Medical reported that it had recognized

18  revenue on 10 systems and had "generated fourth quarter revenues of $7.3 million, a 74% year-over-

19  year increase." On or about February 12, 2009, Hansen Medical management conducted a

20  conference call with company investors and market analysts in which they repeated this information.

21       66.    On or about March 16, 2009, Hansen Medical filed with the Commission its annual

22  report on Form 10-K for the fiscal year ended December 31, 2008. The financial statements that

23  were made a part of Hansen Medical's Form 10-K included $1,310,000 in revenue inappropriately

24  recorded from the sales to Hospital B and to the leasing company associated with Hospital C,

25  amounting to a material portion of Hansen Medical's product revenue for the fourth quarter of 2008

26  as reported. Hansen Medical's Form 10-K for the fiscal year 2008 included inflated sales of Sensei

27  systems resulting in annual revenues of more than $30 million, with a material portion of its annual

28  revenues (and announced sales) based upon the Hospital A, Hospital B and Hospital C transactions.

1        e.    Sells and Murawski Scheme to Use Another Temporary Installation to Create the
                  Appearance of Another Sensei System Sale in the First Quarter of 2009

2

3        67.    On or about March 12, 2009, as the end of Hansen Medical's first fiscal quarter of

4  2009 drew near, Sells sent Hansen Medical's sales force an e-mail that he signed "Mr. Nervous."  In

5  the e-mail, Sells informed the sales staff of Hansen Medical of the importance of the first quarter of

6  2009 results to the company's prospects for raising capital.  Sells stated that he therefore expected the

7  sales staff to complete the sales of at least 10 Sensei systems no later than March 31, 2009, the last

8  day of Hansen Medical's first fiscal quarter.

9        68.    One potential sale that Sells specifically referred to in his e-mail involved a customer

10  hospital ("Hospital D").  On or about Friday, March 27, 2009, Murawski requested that Hospital D

11  sign a contract to purchase a Sensei system and permit installation of the system at Hospital D.  In an

12  e-mail Murawski wrote to a Vice President at Hospital D, Murawski stated:  "I can't stress enough

13  how important this sale is to our organization.  We are in the middle of a $50 million funding round.

14  Therefore, everyone in the organization was counting on this sale."  Also on or about Friday, March

15  27, 2009, Murawski e-mailed another Hospital D executive offering to discount the price for the

16  Sensei system if it would help close the deal before the end of the fiscal quarter (which fell on the

17  following Tuesday), again noting the $50 million funding round, and stating: "It is more important

18  for me to hit a unit number than it is to achieve a specific sales price."

19        69.    Hospital D, however, was not prepared to accommodate the installation of the Sensei

20  system.  To get around the installation requirement, Sells and Murawski again arranged for Hansen

21  Medical personnel to install the system at Hospital D but to then immediately dismantle the system

22  and place it in storage at the hospital until a later date when Hansen Medical would return to install

23  the Sensei system at Hansen Medical's expense.

24        70.    On or about Tuesday, March 31, 2009, while other terms of the contract with Hospital

25  D executives were being negotiated, Hansen Medical personnel installed the Sensei system at

26  Hospital D but immediately took the system apart and placed it into storage at Hospital D.  Based on

27  the temporary installation, the Hansen Medical personnel obtained the signatures from Hospital D for

28

1 the installation completion form.   Later that evening, the final terms of the contract were agreed

2 upon.

3       71.     The signed installation completion form indicating that the Sensei system had been

4 properly and timely installed at Hospital D was provided to the customer service department on or

5 about March 31, 2009, where it was reviewed for completion and then passed along to the senior

6 accountant in the finance department for her review and review by the company Controller.  Neither

7 Sells nor Murawski, nor anyone acting at their direction, informed the company's finance personnel

8 that the Sensei system had only been temporarily installed and immediately dismantled and placed in

9 storage.  The finance personnel were also not told that Hansen Medical was obligated to perform

10 further work at Hospital D to install the equipment at a later date.

11       72.     Following the finance department's review of the forms for the purported Sensei

12 system sale to Hospital D, including the installation completion form, Hansen Medical recorded a

13 sale, and approximately $550,000 in revenue for the sale, during the first quarter ended March 31,

14 2009.

15       73.     The installation completion form for Hospital D was also made available to Hansen

16 Medical's independent audit firm.  Personnel from the audit firm reviewed and concurred with the

17 company's decision to record revenue for the apparent sale of a Sensei system to Hospital D during

18 the first quarter of 2009.

19       74.     On or about April 16, 2009, Hansen Medical publicly announced preliminary financial

20 results for the first quarter of 2009, reporting that it expected to record revenue on the sale of 10

21 Sensei systems and expected to record fourth quarter revenues in the range of $7.0 million to $7.2

22 million.

23       75.     On or about May 5, 2009, Hansen Medical publicly announced its final results for the

24 first quarter of 2009, reporting that it had recorded the sale of 10 Sensei systems, and had generated

25 first quarter revenues of "$7.1 million, a 14% increase compared to revenue of $6.2 million in the

26 same period in 2008." On or about May 5, 2009, Hansen Medical management conducted a

27 conference call with company investors and market analysts in which they repeated this information.

28

76.     On or about May 8, 2009, Hansen Medical filed with the Commission its Form 10-Q for the quarter ended March 31, 2009.  The financial statements included in Hansen Medical's Form 10-Q reported $550,000 in revenue inappropriately recorded from the Hospital D sale, which represented a material portion of Hansen Medical's product revenue during the first quarter.

77.     In or after May 2009, months after Hansen Medical inappropriately recorded revenue for the Sensei system sale to Hospital D, Hansen Medical installation personnel returned to Hospital D and installed the Sensei system, at Hansen Medical's expense.

78.     Sells and Murawski knew, or were reckless in not knowing, that their conduct and the conduct of others carried out at their direction and with their approval, created the false appearance that Hansen Medical had completed a sale to Hospital D, and all the criteria for the company to properly record revenue from a sale had been met, when it had not.

**C.   Hansen Medical Raises Approximately $35 Million of Much Needed Capital**

79.     In or around April 2009, Hansen Medical filed a prospectus supplement with the Commission to supplement its March 2008 effective registration statement.  The prospectus supplement was part of the offer to sell Hansen Medical common stock to the public.  The prospectus supplement incorporated by reference Hansen Medical's Form 10-K for the fiscal year ended December 31, 2008.

80.     On or about April 22, 2009, Hansen Medical sold more than 11.5 million shares of its common stock to public investors, resulting in approximately $35 million in net proceeds to the company.

**D.   Sells Knowingly and Substantially Assisted in the Making of False Statements by Hansen Medical**

81.     For each of the above announcements of financial results, for the third and fourth fiscal quarters of 2008 and the reported annual audited financial results for the 2008 fiscal year, as well as the first fiscal quarter of 2009, Hansen Medical materially mispresented its financial condition and falsely and misleadingly described the basis on which its revenues were recorded, and reported to the public.

82.     Sells knowingly provided substantial assistance to the making of these false or misleading statements by Hansen Medical in each announcement and in each public filing regarding its financial results for the third and fourth fiscal quarters of 2008 and the reported annual audited financial results for the 2008 fiscal year, as well as the first fiscal quarter of 2009. Sells, as a member of Hansen Medical's disclosure committee and through his review of Hansen Medical's filings and public announcements, knew that the statements made by Hansen Medical were not true when made, based in large part on his own conduct and the conduct of others performed at his direction.

83.     Hansen announced in Forms 8-K filed on October 19, 2009 and November 10, 2009, that it intended to issue restated financial statements for the fiscal years ended December 31, 2007 and 2008, for each of the quarters in 2008, and for the first two quarters in 2009. On November 16, 2009, Hansen filed restated financial statements for those periods after determining that revenue from more than twenty sales transactions had been improperly reported. Included within the restated transactions were the Hospital A, Hospital B, Hospital C and Hospital D transactions.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)*
*by Sells and Murawski*

84.     Paragraphs 1 through 83 are re-alleged and incorporated herein by reference.

85.     Defendants Sells and Murawski, directly or indirectly, with scienter, employed devices, schemes, or artifices to defraud, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, of the mails, or the facilities of a national securities exchange.

86.     Defendants Sells and Murawski, directly or indirectly, with scienter engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, of the mails, or the facilities of a national securities exchange.

87. By reason of the foregoing, defendants Sells and Murawski violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 (a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF

*Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) by Sells*

88. Paragraphs 1 through 83 are re-alleged and incorporated herein by reference.

89. Hansen Medical, directly or indirectly, with scienter, made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, of the mails, or the facilities of a national securities exchange.

90. Defendant Sells, by means of the conduct set forth above, knowingly provided substantial assistance to Hansen Medical's violations of Section 10(b) of the Exchange Act and Rule 10(b)5-(b).

91. By reason of the foregoing, defendant Sells violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

*Violations of Section 17(a)(1) and (3) of the Securities Act by Sells and Murawski*

92. Paragraphs 1 through 83 are re-alleged and incorporated herein by reference.

93. Defendants Sells and Murawski, directly or indirectly, with scienter, in the offer or sale of a security, employed devices, schemes, or artifices to defraud.

94. Defendants Sells and Murawski, directly or indirectly, in the offer or sale of a security, engaged in transactions, practices, or courses of business which operates or would operate as a fraud or deceit upon the purchaser.

95. By reason of the foregoing, defendants Sells and Murawski violated, and unless restrained and enjoined will continue to violate, Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

1

## FOURTH CLAIM FOR RELIEF

2

*Aiding and Abetting Issuer Violations of Section 13(a) of the Exchange Act
and Rules 12b-20, 13a-1, and 13a-13 by Sells and Murawski*

3

4    96.    Paragraphs 1 through 83 are re-alleged and incorporated herein by reference.

5    97.    Hansen Medical filed with the Commission an annual report on Form 10-K for the

6  fiscal year 2008, and quarterly reports on Form 10-Q for the third quarter of 2008 and the first quarter

7  of 2009 that contained untrue statements of material fact and omitted to state material information

8  required to be stated therein or necessary in order to make the required statements made, in the light

9  of the circumstances under which they were made, not misleading, in violation of Section 13(a) of the

10  Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§

11  240.12b-20, 240.13a-1, and 240.13a-13].

12    98.    By engaging in the conduct described above, defendants Sells and Murawski

13  knowingly provided substantial assistance to Hansen Medical's violations of Section 13(a) of the

14  Exchange Act, and Rules 12b-20, 13a-1, and 13a-13 thereunder.

15    99.    By reason of the foregoing, defendant Sells and Murawski aided and abetted, and

16  unless restrained and enjoined will continue to aid and abet, violations of Section 13(a) of the

17  Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 promulgated thereunder

18  [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13].

19

## FIFTH CLAIM FOR RELIEF

20

*Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1
by Sells and Murawski*

21

22    100.    Paragraphs 1 through 83 are re-alleged and incorporated herein by reference.

23    101.    By engaging in the conduct described above, defendants Sells and Murawski directly

24  or indirectly, knowingly circumvented a system of internal accounting controls and knowingly

25  falsified a book, record, or account described in Section 13(b)(2) of the Exchange Act [15 U.S.C. §

26  78m(b)(2)].

27

28

102.　By engaging in the conduct described above, defendants Sells and Murawski falsified or caused to be falsified Hansen Medical's required books, records, and accounts, in violation of Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1]

103.　By reason of the foregoing, defendants Sells and Murawski violated and, unless restrained or enjoined, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## SIXTH CLAIM FOR RELIEF

*Aiding and Abetting Violations of Section 13(b)(2)(A) of the Exchange Act by Sells and Murawski*

104.　Paragraphs 1 through 83 are re-alleged and incorporated herein by reference.

105.　Based on the conduct alleged above, Hansen Medical failed to make or to keep books, records or accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and the dispositions of its assets, in violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

106.　By engaging in the conduct described above, defendants Sells and Murawski knowingly provided substantial assistance to Hansen Medical's failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and the dispositions of its assets.

107.　By reason of the foregoing, defendants Sells and Murawski aided and abetted, and unless restrained and enjoined, will continue to aid and abet, violations of 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## SEVENTH CLAIM

*Aiding and Abetting Violations of Section 13(b)(2)(B) of the Exchange Act by Sells and Murawski*

108.　Paragraphs 1 through 83 are re-alleged and incorporated herein by reference.

109.　Based on the conduct alleged above, Hansen Medical failed to devise and to maintain a sufficient system of internal accounting controls, in violation of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

110.    By engaging in the conduct described above, defendants Sells and Murawski knowingly provided substantial assistance to Hansen Medical's failure to devise and to maintain a sufficient system of internal accounting controls.

111.    By reason of the foregoing, defendants Sells and Murawski aided and abetted, and unless restrained and enjoined, will continue to aid and abet, violations of 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## EIGHTH CLAIM

*Violations of Rule 13b2-2 Under the Exchange Act by Sells*

112.    Paragraphs 1 through 83 are re-alleged and incorporated herein by reference.

113.    Defendant Sells, directly or indirectly, while an officer of an issuer, in connection with an audit, review or examination of the financial statements of the issuer required to be made or the preparation or filing of any document or report required to be filed with the Commission, made, or caused to be made, a materially false or misleading statement to an accountant or omitted to state, or caused another person to omit to state to an accountant, a material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading.

114.    By reason of the foregoing, defendant Sells violated, and unless restrained and enjoined, will continue to violate Rule 13b2-2 under the Exchange Act [17 C.F.R. § 240.13b2-2].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

I.

Issue an order permanently restraining and enjoining defendant Sells from violating Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)], and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Rules 10b-5, 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)], and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13];

## II.

Issue an order permanently restraining and enjoining defendant Murawski from violating Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)], and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Rules 10b-5 (a) and (c) and 13b2-1 [17 C.F.R. §§ 240.10b-5(a) and (c) and 240.13b2-1], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)], and Rules 12b-20, 13a-1 and 13a-13  [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13];

## III.

Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], prohibit defendant Sells from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

## IV.

Order defendants Sells and Murawski to pay civil penalties pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of the Court; and

//
//
//
//
//

1

VI.

2

Grant such other relief as this Court may deem just and necessary.

3

4

Respectfully submitted,

5

6

Dated:  October ___6___ , 2011

7

Cameron P. Hoffman
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28